# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

HIBAH SAYED,

    Plaintiff,

    v.

DR. THOMAS TAYLOR,
*Superintendent, Montgomery County*
*Public Schools, in his official capacity*, and
PETER CRABLE,
*Principal of Sligo Middle School, in his*
*official and individual capacities*,

    Defendants.

Civil Action No. 25-1951-TDC

## MEMORANDUM OPINION

Plaintiff Hibah Sayed, a middle school teacher for the Montgomery County Public Schools ("MCPS") in Montgomery County, Maryland, has filed this civil action against Defendants MCPS Superintendent Thomas Taylor and Principal Peter Crable in which she alleges that Defendants violated her right to freedom of speech under the First Amendment to the United States Constitution by barring her from displaying and wearing symbols associated with Palestine while at school. Defendants have filed a Motion to Dismiss, which is fully briefed. A hearing on the Motion was held on April 29, 2026. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

Since 2020, Plaintiff Hibah Sayed has been a teacher at Sligo Middle School ("Sligo"), an MCPS school located in Silver Spring, Maryland. Sayed teaches science and coding to sixth and

seventh grade students and served as the staff sponsor for Sligo's Minority Scholars Program ("MSP") from August 2021 to October 2024.

Sligo displays national flags from across the world in various places throughout the school, including on the walls of the cafeteria. Those displays include the flags of China, Germany, Mexico, Russia, and Israel. Sligo also displays a large "Black Lives Matter" sign in the gymnasium. Am. Compl. ¶ 47, ECF No. 16.

According to Sayed, Sligo has historically allowed teachers to display in their classrooms or wear political messages and messages of support for particular communities. For example, Sligo has permitted teachers to display Black Lives Matter signs in their classrooms and wear Black Lives Matter t-shirts to express support for Black victims of police violence. Sligo has also allowed teachers to wear Pride pins and t-shirts to express support for the LGBTQ community. Sayed displays her own Black Lives Matter sign and Pride flag in her classroom.

## I.    Palestinian Flag Sticker

As Sligo's MSP sponsor, Sayed often used her classroom door and the wall beside it as a makeshift bulletin board to honor the diversity of her students by representing different countries, cultures, and identities. In August 2023, Sayed decorated the inside of her classroom door with several small flag stickers, each no more than four inches wide. One of these stickers depicted the Palestinian flag. Sayed asserts that the presence of these flags did not affect her ability to teach or her students' ability to learn or go about the school day. Instead, the flags occasionally sparked curious questions and observations from students. When one student asked what country the Palestinian flag represented, Sayed responded that it was the flag of Palestine, a country in the Middle East. Another time, a Sudanese student remarked on the similarities between the

Palestinian flag and the Sudanese flag. Sayed took pride in providing a space in which students could have thoughtful and curious conversations about the flags and the people they represented.

## II.    Attire

Since before she arrived at Sligo in 2020, Sayed has worn a keffiyeh, a traditional Palestinian scarf. Sayed has also worn a keffiyeh at Sligo as an expression of her support for the Palestinian people. In late 2023, Sayed purchased, as part of a fundraiser for humanitarian aid to Gaza, a shirt with the words "Gaza: The Soul of my Soul" ("the Gaza shirt"), which commemorated Reem Nabhan, a three-year old Palestinian girl who had been killed by Israeli armed forces in November 2023. *Id.* ¶ 51. In December 2023, Sayed began wearing the Gaza shirt while at Sligo.

## III.    Restrictions

Shortly after the terrorist attacks of October 7, 2023, Sayed became aware that a student's parent had complained to the school about the Palestinian flag on her classroom door. The student did not attend any of Sayed's classes but saw the flag when walking by Sayed's classroom. When the parent asked the Sligo administration to remove the flag sticker, she was told that the flag did not violate any school rules and that Sligo would not require its removal. According to Sayed, the student then repeatedly met with the Sligo administration to complain about the Palestinian flag sticker.

The following school year, on October 8, 2024, Sayed discovered that the Palestinian flag sticker on her door had been removed. When she emailed Sligo administration about the missing sticker, she was summoned to the principal's office for a meeting. At that meeting, Principal Peter Crable informed Sayed that she would not be allowed to put the Palestinian flag sticker back on her classroom door, that she must take off the keffiyeh that she was wearing that day, and that she

would no longer be allowed to wear a keffiyeh inside the school. When Sayed asked why Crable was imposing these restrictions, Crable stated that the flag and keffiyeh could be construed as "antisemitic" or "supporting terrorism." *Id.* ¶ 65. Sayed contends that Crable imposed these restrictions to placate the one student and one parent who had complained. Crable threatened that Sayed would not be allowed to return to her classroom unless she complied with these restrictions. Fearing the loss of her job, Sayed complied. She was, however, permitted to continue to display the other flags on her classroom door.

Two days later, on October 10, 2024, Sayed placed a sticker depicting a watermelon on her classroom door as a symbol of support for Palestine. Although Sayed placed the watermelon sticker on her door as a form of political expression, the image was indistinguishable from any other image of a watermelon. Later that same day, Crable sent Sayed an email that directed her to remove the watermelon sticker from the door and to refrain from displaying it again because it was a symbol of Palestinian solidarity. To keep her job, Sayed removed the watermelon sticker from her classroom door.

On October 21, 2024, while at school, Sayed wore the Gaza shirt, which she had worn at school many times before. In the middle of that school day, the Assistant Principal approached Sayed and escorted her to Crable's office. In his office, Crable told Sayed that she must either change her shirt or leave school for the day. When Sayed explained that her shirt was meant to commemorate a young girl who was killed by gunfire, Crable responded that the shirt was disruptive and could be perceived as antisemitic. Crable would not permit Sayed to return to her classroom until she changed into a school t-shirt in his private bathroom.

4

## IV.   Work Contract

The same day, Crable placed a Memorandum for the Record ("the Memorandum") into Sayed's work contract. In the Memorandum, Crable stated that he asked Sayed to remove the Gaza shirt "because of the ongoing disruption that [it] is causing amongst two of our students and families." Mem. Record at 1, Mot. Dismiss Ex. 1, ECF No. 24-1. Crable also stated that "[e]ffective the date of this memorandum," October 21, 2024, "I am directing you to refrain from wearing, posting, sharing, or in any way displaying information relating to the ongoing conflict in the Middle East." *Id.*; Am. Compl. ¶¶ 79, 89.

The addition of this restriction to Sayed's work contract forced her to comply or risk termination. When Sayed expressed concerns about the directive, Crable stated that MCPS's Department of Compliance and Investigation ("DCI") had approved the addition of the directive to her work contract.

## V.   Procedural History

Between October 21, 2024 and November 8, 2024, Sayed filed a complaint with the DCI. The DCI denied Sayed's complaint on the grounds that Crable's restrictions did not violate MCPS policy. Sayed's appeal of this decision to the DCI Hearing Officer was denied on April 25, 2025 based on the conclusion that Crable's prohibition on "wearing, posting, sharing, or in any way displaying information related to the ongoing conflict in the Middle East" did not violate MCPS policy. *Id.* ¶ 89.

Having exhausted the DCI appeal process, Sayed filed the original Complaint in this case on June 18, 2025. In the presently operative Amended Complaint, Sayed alleges that Defendants' ban on displaying or wearing items associated with Palestine constitutes unconstitutional viewpoint discrimination in violation of the First Amendment to the United States Constitution.

## DISCUSSION

In the Motion to Dismiss, Defendants seek dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that (1) Sayed's expressive activities constitute curricular speech by a public school teacher that is not protected by the First Amendment; and (2) Defendants are immune from Sayed's claim for monetary damages pursuant to the Eleventh Amendment to the Constitution.

### I.     Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).   A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*   Legal conclusions or conclusory statements do not suffice. *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

### II.    First Amendment

Sayed's sole claim is that Defendants' restrictions on her display of symbols or messages related to Palestine constitute viewpoint discrimination in violation of her right to free speech under the First Amendment to the Constitution.

Teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 693 (4th Cir. 2007) (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)).  Nevertheless, public school teachers face certain limitations on their free speech rights "due to the nature of their employment

6

by government-operated schools." *Id.* These limitations arise because the state's interest in regulating the speech of its employees "differ[s] significantly" from the state's interest in regulating "the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Specifically, the state, as an employer, has an interest "in promoting the efficiency of the public services it performs through its employees," which must be balanced with the employee's interest, as a citizen, in speaking about matters of public concern. *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)). Thus, a public employer, including a public school, "possesses greater authority to restrict the speech of its employees" than it has "to restrict the speech of the citizenry as a whole." *Id.*

To assess whether a public employee's expression is protected by the First Amendment, a court first examines "whether the speech at issue was that of a private citizen speaking on a matter of public concern." *Lee*, 484 F.3d at 694 (quoting *Urofsky*, 216 F.3d at 406). If it was, the court must then "consider whether the employee's interest in First Amendment expression outweighs the public employer's interest in what the employer has determined to be the appropriate operation of the workplace." *Id.*

As to the first prong, "when a First Amendment free speech dispute involves a teacher-employee who is speaking within the classroom, the determination of whether her speech involves a matter of public concern is dependent on whether or not the speech is curricular." *Id.* at 697. Drawing from the definition of "curriculum" in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 267 (1988), the United States Court of Appeals for the Fourth Circuit has defined curricular speech as that which "constitute[s] school-sponsored expression bearing the imprimatur of the school" and is "supervised by faculty members and designed to impart particular knowledge to the students." *Lee*, 484 F.3d at 697 (citing *Hazelwood*, 484 U.S. at 271). In assessing whether speech

is "school-sponsored and bears the imprimatur of the school," the court must examine whether it is "so closely connected to the school that it appears that the school is somehow sponsoring the speech." *Id.* at 698 (quoting *Fleming v. Jefferson County Sch. Dist. R–1*, 298 F.3d 918, 925 (10th Cir. 2002)). A court should also consider "the level of involvement the school had in organizing or supervising the contested speech." *Id.* If a teacher's speech is curricular under this definition, it is not private speech on a matter of public concern and thus is not protected by the First Amendment. *Id.* at 700.

In the Motion, Defendants argue only that Sayed's classroom decorations and attire are not private speech but are instead curricular in nature, such that they are not protected speech under the First Amendment. Defendants make no argument in relation to the second prong, that the state's interest in its restrictions outweighs Sayed's interest in her expression.

Defendants rely primarily on the Fourth Circuit's decision in *Lee v. York County School Division*, 484 F.3d 687 (4th Cir. 2007), in which a public school teacher asserted that the removal of posters with arguably religious content that he had displayed on his classroom bulletin board violated his First Amendment right to freedom of speech. *Id.* at 689. The posters included a National Day of Prayer poster depicting George Washington kneeling in prayer, a news article entitled "The God Gap" describing religious and philosophical differences between presidential candidates, a news article entitled "White House Staffers Gather for Bible Study" describing sessions led by the Attorney General of the United States, and articles highlighting the missionary activities of a high school student. *Id.* at 690. The court granted summary judgment in favor of the school based on the determination that the posters were curricular in nature. *Id.* at 700. Specifically, as testified to by the school principal, although the school had an "unwritten policy, custom, and practice" of allowing teachers to post materials on bulletin board "that relate to the

curriculum being taught or that are of personal interest to them," there was also an "unwritten policy" that "inappropriate postings" were subject to removal by the principal, to whom the School Board had granted "broad discretion" to monitor and remove such items. *Id.* at 690. The principal had previously removed items from bulletin boards posted in school hallways and questioned teachers on whether items would be appropriate to post in a classroom. *Id.* at 691 n.5. The court thus concluded that the bulletin boards were "subject to recognized restrictions on the materials that could be properly posted there" and were "subject to the supervision" of the principal who had the authority to remove items, such that it "would be reasonable for students and parents alike to perceive that materials posted on the classroom bulletin boards were closely connected" with the school or "had been approved by its administrators." *Id.* 698–99.

Further, the court concluded that the posters were "supervised by faculty members and designed to impart particular knowledge to the students." *Id.* at 699. In so ruling, the court relied on the testimony of the teacher, who asserted that although he was a Spanish teacher, he was also "responsible for the emotional and moral well-being of his students," and that he had posted the items "to inform his students of certain positive figures and these figures' social and moral values." *Id.* at 699. For example, he testified that he posted the materials about the high school student's missionary activities "to encourage students not to be ashamed of their faith." *Id.* at 692. The court thus concluded that the items were posted "to impart the particular knowledge of these figures and their values to his students in order to expose the students to social and moral values he deemed beneficial to their emotional growth" *Id.* at 700. Having concluded that the bulletin board posters both bore the imprimatur of the school and were designed to impart particular knowledge to students, the court held that the posters were curricular expression unprotected by the First Amendment and granted summary judgment to the school. *Id.* at 700.

9

Defendants argue that *Lee* is directly on point and thus requires dismissal of Sayed's claim. The Court addresses the issue separately in relation to the different aspects of Sayed's claim.

## A.    Classroom Decorations

As to the school's prohibition on displaying the Palestinian flag sticker and watermelon sticker on Sayed's classroom door, *Lee* is highly relevant and may ultimately control the outcome, but the allegations in the Complaint do not establish some of the key factual underpinnings of the holding in *Lee*. First, *Lee*'s conclusion that the posters on the classroom bulletin boards were curricular speech relied significantly on the finding that the classroom bulletin boards were subject to "recognized restrictions on the materials that could be properly posted there" and that the principal was empowered to monitor their contents and remove inappropriate items. *Id.* at 698–99; *see Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 967 (9th Cir. 2011) (finding that a public school teacher had engaged in speech as an employee, not private speech, when he hung banners in his classroom with religious messages "pursuant to a long-standing . . . District policy, practice, and custom . . . of permitting teachers to decorate their classrooms subject to specific limitations and the satisfaction of the principal or a District administrator"). Here, the allegations in the Complaint do not demonstrate whether Sligo imposed any restrictions on the posting of materials on a classroom door, or whether there was a policy, written or unwritten, under which the school principal monitored those postings and removed items for any particular reason. Rather, Sayed has alleged facts that suggest that no such policy or practice exists. Specifically, she has alleged that "Sligo has a history of allowing political messages by teachers in the classroom and other learning spaces," including the posting of Black Lives Matter signs and Pride flags in classrooms, and that no teacher at Sligo "has ever been reprimanded for displaying any of these political messages or instructed to stop displaying their messages." Am. Compl. ¶ 52. At this

10

point, it is particularly unclear whether any such policy or practice was in place in relation to materials displayed on a classroom door, which is a different and less prominent space as compared to the classroom bulletin board.

In other cases, courts have made the determination, based on the specific facts at issue, that materials and messages displayed by teachers in a classroom were private speech. For example, in *Cajune v. Independent School District 194*, 105 F.4th 1070 (8th Cir. 2024), the United States Court of Appeals for the Eighth Circuit considered whether teachers who displayed Black Lives Matter posters in their classrooms had engaged in private speech. *Id.* at 1079–80. The court held that because private actors designed and advocated for the display of the posters, and because the school district gave individual teachers discretion as to whether and where to post the Black Lives Matter posters, their display could be deemed to be private speech. *Id.* at 1080–82; *cf. Thomas v. Marshall Pub. Schs.*, 152 F.4th 884, 890 (8th Cir. 2025) (distinguishing a middle school principal's use of school funds and staff for an in-school installation of LGBTQ Pride flags from the *Cajune* teachers' discretion to post Black Lives Matter posters created by private actors). Although factually distinguishable from the present case, *Cajune* demonstrates that the determination of whether a display in a classroom is private speech is a fact-based determination that is not readily resolved at the motion-to-dismiss stage. *See Cajune*, 105 F.4th at 1079–82 (considering the specific facts at issue and reversing the grant of a motion to dismiss); *see also Fleming v. Jefferson Cnty. Sch. Dist. R-1*, 298 F.3d 918, 931 (10th Cir. 2002) (noting that the court must "examine the record as a whole," including as to "what the school actually did," in assessing whether a particular display bore "the imprimatur of the school"). Therefore, at this early stage of the case, in the absence of allegations and facts showing a school policy of monitoring displays such as those including the Palestinian flag and watermelon stickers, the Court will not conclude definitively

11

that Sligo teachers, students, and parents understood Sayed's classroom decorations to be subject to recognized restrictions such that they bore the imprimatur of the school.

Second, *Lee*'s conclusion that the bulletin board postings were displayed in order to impart particular knowledge to students was grounded in the factual record of that case, in which the teacher acknowledged that the posters were intended to impart knowledge, including by testifying that he felt responsible for more than just the academic well-being of his students, that he was "accountable in that classroom" for students' "welfare and their attitudes and their feelings," and that some of the posted articles were "helpful to a student seeking hope and inspiration" or were "posted to encourage students not to be ashamed of their faith." *Lee*, 484 F.3d at 692. Here, the allegations in the Amended Complaint provide an incomplete picture of the facts underlying this issue. Sayed has acknowledged that the Palestinian flag sticker was displayed along with other international flags as a "makeshift bulletin board for different countries, cultures, and identities" in order to "honor[] the diversity of her students" in a manner similar to the way that "Sligo Middle School celebrates the rich diversity of its students and staff by hanging large flags of many countries on its walls." Am. Compl. ¶¶ 1, 3. She has also stated that the flag has led to student comments, including a question on what the flag was and a remark that it was similar to the flag of a student's native country of Sudan, and thus gave her students "a safe space to have thoughtful and curious conversations about the flags and the people they represent." *Id.* ¶ 39. Sayed, however, has not alleged facts showing that she ever used the Palestinian flag sticker as part of any lesson or that it was intended to convey any particular message to students.

At this early stage, where the Court must view the allegations in the light most favorable to Sayed, the Court finds that further factual development is required to assess properly whether the flag sticker was presented to impart knowledge to students in a manner comparable to that in

12

*Lee.* Moreover, as to the watermelon sticker, Sayed has asserted that she posted it as "a symbol of support for Palestine," *id.* ¶ 70, has identified no discussions with or among students relating to that sticker, and has provided no facts demonstrating that it was intended to, or ever used to, impart knowledge to students.

Where the allegations in the Amended Complaint do not definitively establish whether Sligo had any policy or practice relating to the monitoring of, and restrictions on, items placed by teachers on a classroom door, and where the record is incomplete on the issue of whether the posted items were intended to impart particular knowledge or skills to students, the Court finds that it cannot, at this early stage, find that items posted on Sayed's classroom door constitute curricular speech rather than private speech on a matter of public concern. Where Defendants presently offer no argument that its interest in its restrictions outweighs Sayed's interest in First Amendment expression, the Court concludes that dismissal in relation to the classroom decorations is not presently warranted and that further factual development is required.

### B.    Attire

Sayed also argues that the restrictions on her attire, specifically, the bans on wearing a keffiyeh and the Gaza shirt, violate the First Amendment. Although Defendants again invoke *Lee*, the Court does not find that it mandates dismissal at this point. First, *Lee* is factually distinguishable in that it did not address a teacher's personal attire, which is qualitatively different from items displayed on a classroom bulletin board. Although the two-part test articulated in *Lee* must be applied, as with the classroom decorations, the allegations in the Amended Complaint do not demonstrate that Sligo had a policy or practice of monitoring or restricting teachers' attire, even in the classroom. Rather, as discussed above, Sayed has asserted that Sligo historically permitted political messages by teachers in classrooms and learning spaces, pursuant to which

13

teachers have worn Pride pins and t-shirts to support the LGBTQ community, as well as Black Lives Matter t-shirts to support Black victims of police violence. Sayed has also asserted that she had frequently worn the keffiyeh and the Gaza shirt prior to Crable's imposition of restrictions. These allegations, viewed in the light most favorable to Sayed, suggest the absence of any policy or practice of monitoring teacher attire that could potentially demonstrate that a teacher's personal attire was deemed to be school-sponsored expression bearing the school's imprimatur. At a minimum, they do not establish the kind of policy or practice underlying the ruling in *Lee*.

Second, the allegations in the Amended Complaint do not definitively establish that Sayed's wearing of the keffiyeh or the Gaza shirt was designed to impart particular knowledge to students in that her "purpose [was] to convey a specific message or information to students." *Lee*, 484 F.3d at 699. In the Amended Complaint, Sayed asserted that she wore the keffiyeh "to express support for the Palestinian people" and the Gaza shirt to "commemorate a young girl who was killed by gunfire" and provided no facts suggesting that she ever discussed these items with students or that they were intended to convey a lesson or message to students, as was the case in *Lee*. Am. Compl. ¶¶ 50, 77. The Court therefore concludes that factual development is required in order to make a determination on whether Sayed's attire is properly deemed to be curricular speech rather than private speech.

Notably, although the Fourth Circuit has not directly addressed whether any messages associated with a teacher's attire constitute curricular speech or private speech, other circuits have found that a teacher's expressive attire constituted private speech and thus was protected by the First Amendment. In *James v. Board of Education of Central District No. 1*, 461 F.2d 566 (2d Cir. 1972), the United States Court of Appeals for the Second Circuit considered whether a school board violated the First Amendment when it fired a teacher for wearing a black armband in the

14

classroom to protest the Vietnam War. *Id.* at 568. The court found that where the teacher made no attempt "to proselytize his students" about the Vietnam War, and it "[did] not appear from the record that any student believed the armband to be anything more than a benign symbolic expression of the teacher's personal views," the armband was an expression of the teacher's private views subject to First Amendment protections. *Id.* at 574. In *Dodge v. Evergreen School District #114*, 56 F.4th 767, 778 (9th Cir. 2022), the United States Court of Appeals for the Ninth Circuit concluded that a teacher who wore a "Make America Great Again" ("MAGA") hat to professional development sessions had engaged in private speech that was protected under the First Amendment. *Id.* at 772–73, 778. Although the *Dodge* court relied not only on the fact that the teacher had no official duty or requirement to wear the hat but also on the fact that he did not wear it when with students, *id.* at 778, neither that case nor any other identified by Defendants has concluded that the wearing of an item with an expressive message in front of students categorically constitutes curricular speech. Thus, the case law shows that a teacher's personal attire could constitute private speech, and that the determination of whether it constitutes curricular or private speech is a fact-based determination.

Defendants' reliance on *El-Haggan v. Board of Education for Montgomery County*, No. 24-CV-00442-LKG, 2025 WL 1952516 (D. Md. July 16, 2025), does not alter this conclusion. In *El-Haggan*, the court found that an MCPS teacher who wore "homemade pins, buttons and outfits containing the slogan 'Free Palestine'" while in the classroom and had distributed "'Free Palestine' buttons to other teachers at her school" had engaged in curricular expression. *Id.* at *10. El-Haggan's conduct thus went beyond the wearing of a traditional scarf as an item of clothing or a shirt that lacked a specific political message and instead consisted of the presentation of an affirmative political message directly to students and active efforts to encourage other teachers to

join in the same expressive conduct. Again, where the facts of the present case remain undeveloped, particularly in relation to the degree to which Sligo exercised control over teachers' attire, the Court finds that it is premature to conclude that Sayed's significantly more passive conduct would be likely to be viewed by students and parents as "approved and supported by the school." *El-Haggan*, 2025 WL 1952516 at *10.

Thus, at this early stage, the Court finds that further factual development is required before it may determine whether Sayed's attire constituted school-sponsored expression bearing the imprimatur of the school, whether her attire was designed to impart particular knowledge or skills to her students, and thus whether it constituted curricular speech. Under these circumstances, and where Defendants have offered no argument on whether their interest in the restrictions on Sayed's attire outweighs Sayed's interest in First Amendment expression, the Court will not dismiss Sayed's First Amendment claim relating to her prohibited attire.

## C.    Work Contract

Finally, the Court addresses Sayed's allegation that Defendants' restrictions on Sayed's expressive activity extends beyond the classroom. Sayed has alleged in the Amended Complaint that the amendment to her work contract as set forth in Crable's October 21, 2024 Memorandum bars Sayed from displaying or wearing symbols relating to Palestine at any location, on or off school premises. Specifically, in the Memorandum, Crable broadly stated that, effective on the date of the Memorandum, "I am directing you to refrain from wearing, posting, sharing, or in any way displaying information relating to the ongoing conflict in the Middle East." Am. Compl. ¶¶ 79–80; Mem. Record at 1. The Memorandum does not specify any limits to this directive, such as a qualification that the prohibition applies only when Sayed is in a classroom, when she is in the presence of students or parents, or when she is on school premises.

16

A teacher's workplace speech or expression on a matter of public concern, however, is analyzed differently if it is limited to activities at which students and parents are not present. *See Dodge*, 56 F.4th at 778 (holding that a teacher wearing a MAGA hat during teacher and professional development meetings was properly deemed to have engaged in private speech on a matter of public concern); *El-Haggan*, 2025 WL 1952516, at *11 (finding that a public school teacher's inclusion of a pro-Palestinian slogan as part of an email signature sent to school personnel but not to students and parents did not constitute curricular speech); *see also Lee*, 484 F.3d at 698 (noting that whether a teacher speaks in the classroom or outside of it impacts whether the speech is likely to be viewed "as approved and supported by the school"). A teacher's expressive activity when not on duty and not on school premises is more likely to be deemed private speech on a matter of public concern, rather than speech made in the course of a public employee's official duties. *See Pickering*, 391 U.S. at 564–65, 569 (holding that a teacher's criticism in the local newspaper of his school district's funding plan was protected speech in part because the statement was not "directed towards any person with whom [he] would normally be in contact in the course of his daily work as a teacher"); *Johnson*, 658 F.3d at 970 (stating that a public teacher generally may voice his own opinions "on the sidewalks, in the parks, through the chat-rooms, at his dinner table, and in countless other locations" other than the classroom (citation omitted)); *El-Haggan*, 2025 WL 1952516, at *12 (declining to dismiss a First Amendment claim based on teachers' social media posts on their personal accounts because they "did not engage in this speech pursuant to their duties as MCPS teachers"); *see also Jorjani v. New Jersey Inst. of Tech.*, 151 F.4th 135, 138–39, 141 (3d Cir. 2025) (noting that it was undisputed that a university professor's comments made while in a pub were private speech).

In the Motion, Defendants provide no basis to dismiss the part of Sayed's claim based on the October 21, 2024 memorandum and instead unpersuasively claim in their reply brief and at the hearing on the Motion that the directive limits its reach to Sayed's activities on school grounds. This argument is contradicted by the plain language of the memorandum. Where Sayed has plausibly alleged that she has been subjected to a restriction on private speech occurring outside of the classroom, off of school premises, and while she is off duty, the Court will deny the Motion as it relates to the broad restrictions imposed by the memorandum.

## III.    Eleventh Amendment Immunity

Defendants also assert that, to the extent that Sayed seeks monetary damages, the Eleventh Amendment provides immunity to Defendants for the claims against them in their official capacities. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment immunizes states, state agencies, state instrumentalities, and state officials sued in their official capacities from suit by private parties in federal court. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98, 100–02 (1984); *Bland v. Roberts*, 730 F.3d 368, 389–91 (4th Cir. 2013) (holding that federal court claims for damages against a state official in his official capacity are barred by the Eleventh Amendment).

The United States Supreme Court has stated that claims against individual defendants in their official capacities are the equivalent to suits against the State, to which Eleventh Amendment immunity applies. *See Kentucky v. Graham*, 473 U.S. 159, 165–69 (1985) (stating that a § 1983 official capacity suit should "be treated as a suit against the entity"). However, Eleventh Amendment immunity does not extend to § 1983 claims against individual defendants in their

18

personal capacities. *Hafer v. Melo*, 502 U.S. 21, 31 (1991). "[O]fficers sued in their personal capacity come to court as individuals" rather than as extensions of the State. *Id.* at 27. Accordingly, the Motion will be granted as to the claim for monetary damages against Defendants in their official capacities. However, the claim for damages against Principal Crable in his individual capacity remains intact, as does Sayed's claim for prospective injunctive relief against Defendants, including in their official capacities. *See Pennhurst State Sch. & Hosp.*, 465 U.S. at 102–03 (citing *Ex Parte Young*, 209 U.S. 123 (1908)).

**CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART in that the Motion will be granted as to any claim for monetary damages against Defendants in their official capacities and will be otherwise denied. A separate Order shall issue.

Date:  June 1, 2026

THEODORE D. CHUANG
United States District Judge